CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

**JUL 2 0 2016**

JULIA C. DUDLEY, CLERK
BY: _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

MICHAEL KING, )
)
    Plaintiff, )
) Civil Action No. 7:14CV00602
v. )
) **MEMORANDUM OPINION**
PULASKI COUNTY SCHOOL BOARD, )
) By: Hon. Glen E. Conrad
    Defendant. ) Chief United States District Judge
)

    Michael King filed this action under Title VII of the Civil Rights Act of 1964 ("Title

VII") against his employer, Pulaski County School Board (the "School Board"). Plaintiff alleges

that he was retaliated against after complaining about an inappropriate relationship between his

former wife, Lori King, and her co-worker, Maureen Spaulding, as well as certain conduct by

Spaulding. The case is presently before the court on the School Board's motion for summary

judgment. For the reasons set forth below, the motion will be granted.

### Factual Background

    The following facts are either undisputed or presented in the light most favorable to

plaintiff. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (emphasizing that

"[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn

in his favor," when ruling on a motion for summary judgment).

    In 2000, plaintiff began working as a first grade teacher at Riverlawn Elementary School

("Riverlawn") in Pulaski County. He held the position for six years before becoming the

assistant principal at Dublin Middle School ("Dublin Middle") in Pulaski County, a position he

has held for the past ten years. In his assistant principal position, plaintiff handles student

disciplinary issues, staff evaluations, day-to-day maintenance of the building, and overall

supervision of the school. His current supervisor is Adam Joyce, who serves as the principal of Dublin Middle. Prior to Joyce, Robin Keener was plaintiff's immediate supervisor.

Lori King, plaintiff's ex-wife, is a librarian at Riverlawn. In 2009, Maureen Spaulding joined Riverlawn as the assistant principal. The two women became friends and started socializing outside of work, both together and as a group with plaintiff and Spaulding's husband. At first, plaintiff and Spaulding got along, and she tried to help plaintiff with his marital issues. In July of 2010, the Kings and the Spauldings took a trip to Hershey, Pennsylvania. During this trip, plaintiff claims that Spaulding touched him inappropriately and tried to kiss him. After plaintiff informed her that such conduct made him uncomfortable, she stopped and never touched him again. Plaintiff admits that he did not report this incident to anyone at the School Board or any school employee.

Plaintiff also alleges that Spaulding harassed him and created a hostile environment at work. At some point in 2010, plaintiff claims that Spaulding sent him a message saying that, "You've lost your wife, haven't you, and your family is next." King Dep. 16:21-16:22, Docket No. 51-2. Plaintiff did not report this communication to anyone at the School Board or any school employee. In addition, plaintiff alleges that Spaulding sent him two photographs of his daughter and Mrs. King together at Riverlawn's library. Plaintiff believes that Spaulding was doing a walkthrough at the time she took the pictures, and he cannot recall if there was a text message that accompanied the pictures. Plaintiff also alleges that Spaulding gave him the middle finger during several administrative meetings; he estimates that it happened between five to ten times. Plaintiff reported this conduct to Keener, who was his immediate supervisor at the time; Joe Makolandra, the former director of human services for the School Board; and Dr. Michael Perry, principal of Dublin Elementary School and plaintiff's friend. However, plaintiff did not

2

ask them to take any action on his behalf or report the incidents to anyone else. According to plaintiff, neither Keener nor Dr. Michael Perry personally witnessed Spaulding give him the middle finger. In fact, plaintiff's explanation for reporting the incidents to Dr. Michael Perry was so that "he could catch [Spaulding]" in the act. Id. at 141:5-141:6.

Plaintiff also alleges that an inappropriate relationship developed between Mrs. King and Spaulding. According to plaintiff, Mrs. King and Spaulding "spent the night together," "went on trips together," held hands, rubbed each other, and slept together in the same bed. Id. at 12:14-12:16. Plaintiff claims that he personally observed the two women lying in bed together and saw Spaulding rub Mrs. King's thigh when they were all out to dinner at Applebee's. Plaintiff concedes, however, that he did not observe physical contact between Mrs. King and Spaulding at Riverlawn. He is also not aware of any other individual who witnessed physical contact between Mrs. King and Spaulding during school hours.

Plaintiff does not believe that this was the first inappropriate relationship between Spaulding and others persons within the Pulaski County school system. In his deposition, plaintiff testified that Rod Reedy, former principal at Pulaski High School, had informed him that Spaulding had a similar relationship with his wife before Spaulding met Mrs. King. Plaintiff, however, does not know the nature of the relationship between Spaulding and Mrs. Reedy. Plaintiff also believes that a family preservation services counselor at Riverlawn broke off her engagement after befriending Spaulding.

In the fall of 2010, plaintiff met with Makolandra, as both his friend and as the director of human resources, to "ask for his advice" about the inappropriate relationship between Spaulding and Mrs. King. Id. at 44:7. The two met at Makolandra's house. At the time, plaintiff did not perceive this communication as a complaint, did not ask Makolandra to take any actions on his

3

behalf, and did not have any expectation that Makolandra was going to do anything for him. In fact, Makolandra was in his last week as the director of human resources at the time of this meeting. Makolandra advised plaintiff to speak with John Bowler, the principal at Riverlawn.

On September 22, 2010, plaintiff met with Bowler to discuss the relationship between Mrs. King and Spaulding. At the time, plaintiff believed that his complaint constituted an employment matter. The two met after school hours and at Randolph Park because plaintiff was "good friends" with Bowler and "hated putting [Bowler] in this situation." Id. at 48:13-48:14. At the meeting, plaintiff also told Bowler about the previous relationship between Spaulding and Mrs. Reedy. After the meeting, plaintiff believes that Bowler spoke to Greg Brown, the new director of human resources.

In early 2011, plaintiff filed for divorce from Mrs. King. Spaulding testified on behalf of Mrs. King at the Kings' child custody hearing. After that hearing, the judge ordered that Spaulding have no contact with the Kings' children outside of her duties as assistant principal of Riverlawn.

On August 10, 2011, Brown contacted plaintiff and they met in Brown's office to discuss the inappropriate relationship between Mrs. King and Spaulding. On August 12, 2011, Brown documented plaintiff's formal complaint against Spaulding. The formal complaint alleged that Mrs. King and Spaulding talked on the phone multiple times during school hours and took at least three shopping trips together. In the complaint, plaintiff also claimed that several teachers and staff members at Riverlawn had voiced their concerns about the women's relationship. In his deposition, plaintiff clarified that a teacher at Riverlawn, Marsha Simpkins, had told him that "there's obviously something odd going on" between Mrs. King and Spaulding. Id. at 60:2-60:3. The formal complaint also alleged that, outside of school hours, Mrs. King and Spaulding spent

4

nights together, shared a bed, held hands in public, engaged in inappropriate touching, texted frequently, and would hang out at Spaulding's house until as late as 3:00 a.m. When asked what plaintiff wanted to do about these allegations, he told Brown that he wished "this to be a matter of record." Id. at 62:15-62:16; Ex. 15 to Pl.'s Br. in Opp. to Mot. For Summ. J., Docket No. 56-16. Plaintiff did not allege that this conduct affected his employment and insisted that he was complaining as a parent of a Riverlawn student. In his deposition, Brown testified that plaintiff was very clear that he wanted the complaint to be handled as a complaint from a parent, not an employee. Plaintiff does not recall making any other complaints to Brown, aside from those listed in the formal complaint. During his deposition, plaintiff testified that he believed that Brown seemed angry about the complaint, based on his short answers and demeanor. Brown advised plaintiff that it was likely that plaintiff would not be informed as to the disposition of his complaint against Spaulding.

   Once Brown confirmed with plaintiff that all of his complaints were accurately noted, Brown reviewed the relevant School Board policies. Brown then spoke to Spaulding, who denied the allegations that she and Mrs. King were holding hands in public, lying in bed together, or having an inappropriate relationship. Spaulding did admit to having phone calls and sending text messages with Mrs. King during school hours, but explained that she was trying to help the Kings save their marriage. Brown determined that only the text messaging required corrective action, as he believed that school administrators should be spending their time equally among their employees. He did not, however, believe that the number of text messages supported plaintiff's allegation that the women had an inappropriate relationship, especially because the women were close friends, and Spaulding claimed that she was helping the Kings with their marital issues. Brown did not investigate the contents of the text messages; he believed that the

5

nature of their relationship was not material because it was not against school policy for couples to work together, as long as they did not directly supervise each other. According to her sworn declaration, Dr. Shirley Perry, the current director of human resources for the School Board, confirmed that such a relationship would not violate School Board policy. Brown confirmed that plaintiff was the only person who had complained to him about the relationship between Mrs. King and Spaulding. Until this litigation, Brown was also not aware of any allegations that Spaulding had inappropriately touched plaintiff, or that Spaulding had given plaintiff the middle finger at meetings.

Plaintiff claims that the School Board took adverse employment actions against him in retaliation for his complaints. First, plaintiff alleges that he was subjected to a hostile environment, and that Brewster was responsible for plaintiff's ostracization at work. Specifically, plaintiff believes that Brewster's demeanor towards him changed after the complaints, and that the other employees were intimidated by Brewster and avoided plaintiff in fear of Brewster's reaction. Plaintiff also claims that Keener, the only person who still spoke to him at the time, was transferred against her will because she was friends with plaintiff. In her deposition, Keener testified that she believed that she was moved to a new position because of a situation that had no relationship to this case. Kimberly Alger, plaintiff's office assistant at Dublin Middle, confirmed that Brewster did not speak to plaintiff, and that the situation was "very tense." Alger Dep. 7:25, Docket No. 56-9. In his deposition, Brewster admitted that he sometimes did not speak to plaintiff. Plaintiff conceded that his explanation for the hostile work environment is purely speculation, and that he is not aware of any comments made by Brewster about him.

Second, plaintiff claims that he was denied certain promotions in retaliation for his complaints. In 2011, plaintiff applied for a principal position at Pulaski High School ("Pulaski

6

High"), but did not receive an interview. At the time, plaintiff did not have any experience as a high school administrator and had not worked as a high school teacher. According to Brown, there were several applicants for the position, and he believed that plaintiff did not have the experience to take on the role at such a large high school. The individual who was selected for the position had previously served as a high school principal in another county and had experience as both a superintendent designee and a teacher.

That same year, plaintiff applied for a principal position at Pulaski Middle School ("Pulaski Middle"). The superintendent, Dr. Robert Becker, selected Theresa Reed for the position. At the time, Reed was the coordinator of student services in the School Board's central office and had served as a guidance counselor at Pulaski Middle. In his deposition, Brown testified that the School Board was going through a reorganization period at the time, and that Reed's position had been dissolved and absorbed into other departments. Because of the change in her position, Dr. Becker selected Reed without an interview.

In 2012, plaintiff applied for a principal position at Critzer Elementary School ("Critzer") and was selected for an interview. Each candidate for the position had thirty minutes to meet with the interview committee. Brown was responsible for selecting the members of the interview committee. For this position, the interview committee consisted of Brown, Deborah Hodges, and two teachers. Brewster was also present during the interviews, but was not a member of the interview committee. The interview committee did not make the ultimate hiring decision but, instead, simply recommended a candidate to Brewster. In his deposition, Brewster testified that he always accepted the interview committee's recommendation. According to Hodges' sworn declaration, the interview committee followed the standard procedure for these interviews, in which the interview committee asked each candidate the same questions from a script and gave

7

each candidate the same opportunity to respond. Brewster, Brown, and Hodges all felt that plaintiff interviewed poorly. Specifically, Hodges believed that plaintiff was knowledgeable, but could not articulate his responses. Plaintiff, however, testified that Brown cut him off at several points during his interview and would not let him finish his answers. The position ultimately went to Michael Grim, who had experience as an elementary school teacher, instructional technology resource teacher, and a high school principal. Grim was the committee's unanimous first choice. Hodge was very impressed with Grim's knowledge and engaging presence. The second-ranked candidate was Dr. Michael Hickman, who was the assistant principal at Critzer, had forty years of experience, and had obtained a Ph.D. At the time, Dr. Hickman was also the longest tenured administrator in the county. Plaintiff was ranked last for the position. According to Brewster's sworn declaration, no one discussed plaintiff's prior complaints during the interview process, and he had no reason to believe that any persons other than himself and Brown were aware of the complaints.

In 2013, Reed left her position as principal of Pulaski Middle and accepted a job in another jurisdiction. Brewster then selected Mary Rash to serve as interim principal for the rest of the school year. No interviews were held for the position. According to Brewster and Brown, Rash was a former math teacher and assistant principal at Pulaski High with thirty years of experience.

In 2014, plaintiff applied for a principal position at Pulaski Elementary and was selected to interview. The interview committee for this position consisted of Brown; Dr. Shirley Perry; Ruth Vordo, guidance counselor at Pulaski Elementary; Stacey Heller, Director of Curriculum Instruction and Academic Support for the School Board; and Jan Booker, first grade teacher at Pulaski Elementary. The committee interviewed four candidates for the position: Rebecca Smith;

8

Kim Sink, the assistant principal at Pulaski Elementary; Mr. Griffin, a principal from Floyd County; and plaintiff. According to the interview committee members' sworn declarations, the interview process was the same for each candidate. Because Pulaski Elementary had been under a school improvement plan, the interview committee expected that the candidates would be familiar with the particular needs of the school. During deliberations, the interview committee was divided between Smith and Sink, but ultimately recommended Smith for the position. According to Dr. Shirley Perry, Smith previously worked as a principal at an elementary school in Roanoke City with similar demographics to Pulaski Elementary and had shown improvements at that school. Smith also interviewed very well, showed enthusiasm for the position, and was a proven leader. Griffin was the interview committee's third choice, as he did not speak to the specific needs of the school and county. Plaintiff was the committee's fourth choice. According to Booker, plaintiff interviewed poorly, had weak responses to questions about the school improvement process, and did not inspire confidence. According to Heller, plaintiff did not "do his homework" as to the particular needs of the school. Heller Decl. ¶ 4, Docket No. 51-18. Vordo also confirmed that plaintiff did not interview well. Brewster was not present during these interviews. According to her sworn declaration, Dr. Shirley Perry indicated that the interview committee members were not aware of plaintiff's complaints and neither Brown nor Brewster tried to influence the interview committee's assessment of the candidates.

At the end of the 2013-2014 school year, Spaulding left Riverlawn and took a position at Critzer. Plaintiff then requested a transfer to Spaulding's position. At the time, Mrs. King still worked as a librarian at Riverlawn. Brown, Perry, and Brewster discussed plaintiff's transfer request, and Brewster decided to deny it. Brown explained that, if plaintiff were transferred to Riverlawn, there would be a whole new administration team at Dublin Middle, as a new

9

principal was also starting that school year. Because of this, Brown did not believe that transferring plaintiff would be in the best interest of the students at Dublin Middle. In his deposition, Brewster testified that he did not want plaintiff to be supervising Mrs. King, as they had recently gone through a divorce. In 2014, plaintiff also was asked to serve as a summer school administrator for Pulaski Elementary School; however, he did not ultimately serve in that capacity. Instead, plaintiff was on medical leave during the summer of 2014.

## Procedural History

On November 3, 2014, plaintiff filed the instant action against the School Board, in which he asserts a single claim of retaliation under Title VII. Following the close of discovery, the School Board moved for summary judgment. The court held a hearing on the motion on July 11, 2016. The motion has been fully briefed and is now ripe for disposition.

## Standard of Review

An award of summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party." Libertarian Party of Va. v. Judd, 718 F.3d 308, 313 (4th Cir. 2013) (internal quotation marks omitted). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" Id. (quoting Anderson, 477 U.S. at 248).

In considering a motion for summary judgment, the court must view the record in the light most favorable to the nonmoving party. Tolan v. Cotton, 134 S. Ct. 1861, 1866 (2014). To withstand a summary judgment motion, the nonmoving party must produce sufficient evidence from which a reasonable jury could return a verdict in her favor. Anderson, 477 U.S. at 248. "Conclusory or speculative allegations do not suffice, nor does a mere scintilla of evidence in

10

support of [the nonmoving party's] case." Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 (4th Cir. 2002) (internal quotation marks omitted).

## Discussion

Plaintiff claims that the School Board violated Title VII by retaliating against him because of his complaints about the inappropriate relationship between Mrs. King and Spaulding, as well as Spaulding's conduct towards him. In addition to prohibiting discrimination on the basis of a protected trait, Title VII makes it unlawful for an employer to retaliate against an employee for engaging in activity protected by the statute. See 42 U.S.C. § 2000e-3(a). When there is no direct evidence of retaliation, a plaintiff may proceed under the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1983). See Price v. Thompson, 380 F.3d 209, 212 (4th Cir. 2004). This framework requires the plaintiff to initially establish the following elements by a preponderance of the evidence: (1) that he engaged in a statutorily protected activity; (2) that he suffered an adverse employment action; and (3) that a causal connection existed between the protected activity and the adverse action. EEOC v. Navy Fed. Credit Union, 424 F.3d 397, 405-06 (4th Cir. 2005).

The first element of the prima facie case requires that the plaintiff demonstrate that he participated in a protected activity. The retaliation provisions of Title VII include both an opposition clause and a participation clause. Kubicko v. Ogden Logistics Servs., 181 F.3d 544, 551 (4th Cir. 1999). The opposition clause makes it unlawful for an employer to retaliate against an individual because he "opposed any practice" made unlawful by Title VII, while the participation clause makes it unlawful to retaliate against an individual because he "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or

11

hearing under [Title VII]." Id. (quoting 42 U.S.C. § 2000e-3(a)).[1] Under the opposition clause, the plaintiff must oppose "not only ... employment actions actually unlawful under Title VII but also employment actions he reasonably believes to be unlawful." Navy Fed. Credit Union, 424 F.3d at 406. To qualify as an opposition activity, "an employee need not engage in the formal process of adjudicating a discrimination claim." Laughlin v. Metro. Wash. Airports Auth., 149 F.3d 253, 259 (4th Cir. 1998). "Opposition activity encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." Id.

The second element of the prima facie case requires the plaintiff to show that he suffered an adverse employment action. For an action to qualify as an adverse action under the anti-retaliation provision of Title VII, the plaintiff "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means that it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 68 (2006) (internal citation and quotation marks omitted). Although a materially adverse action is not limited to one that affects the terms and conditions of employment, "petty slights, minor annoyances, and simple lack of good manners" are insufficient to support a retaliation claim. Id.

The third element requires the plaintiff to establish that a causal relationship existed between the protected activity and the adverse action. To prove a causal connection, the plaintiff must be able to show that the employer failed to promote him "because the plaintiff engaged in a protected activity." Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir. 1998).

---

[1]     Based on the allegations in the complaint and the arguments in the summary judgment pleadings, it appears that plaintiff is only pursuing his retaliation claim under the opposition clause.

12

When the plaintiff establishes the foregoing elements, the burden shifts to the employer to articulate a legitimate, nonretaliatory reason for its purportedly retaliatory action. Id. at 250. If the employer makes this showing, "the burden shifts back to the plaintiff to rebut the employer's evidence by demonstrating that the employer's purported nonretaliatory reasons 'were not its true reasons, but were a pretext for discrimination.'" Id. (quoting Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004) (en banc)). "In order to carry this burden, a plaintiff must establish 'both that the [employer's] reason was false and that [retaliation] was the real reason for the challenged conduct.'" Id. at 252 (alterations in original) (quoting Jiminez v. Mary Wash. Coll., 57 F.3d 369, 378 (4th Cir. 1995)). In other words, the plaintiff must prove that retaliation was the "but-for cause" of the challenged adverse action. Id.

Having summarized the applicable legal standards for evaluating a Title VII retaliation claim, the court turns to the allegations in the instant case. Plaintiff claims that the School Board took adverse employment actions against him in retaliation for his complaints about the inappropriate relationship between Mrs. King and Spaulding, as well as certain hostile and harassing conduct by Spaulding. In his opposition brief to the pending motion for summary judgment, plaintiff argues that he suffered retaliatory actions when he was denied certain promotions, and when Brewster, Brown, and others created a hostile environment for him.

As to the first factor, the court concludes that no reasonable jury could find that plaintiff engaged in a protected activity. Title VII makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). In her sworn declaration, Keener asserted that plaintiff had advised her that Spaulding inappropriately touched him while they were in Hershey,

13

Pennsylvania, and that Spaulding had given him the middle finger at administrative meetings. This is despite plaintiff's testimony that he did not report the inappropriate touching to any School Board employee. Furthermore, the evidence in this case demonstrates that plaintiff lodged a formal complaint against Spaulding based on her allegedly inappropriate relationship with Mrs. King.

Based on the record, the court believes that no reasonable jury could find that plaintiff would have been reasonable in believing that his complaints implicated Title VII. In fact, with the exception of Spaulding giving plaintiff the middle finger at administrative meetings, plaintiff's complaints did not involve work-related issues. Instead, Spaulding allegedly touched plaintiff while they were on vacation in Hershey, Pennsylvania. Plaintiff did not assert that such conduct affected his employment, and he admitted in his deposition that Spaulding never touched him again. As to the complaint about Spaulding's relationship with Mrs. King, plaintiff lodged his formal complaint as a parent of a Riverlawn student. It is undisputed that plaintiff was adamant that his complaint not be treated as a complaint from a School Board employee. In fact, during his deposition, plaintiff conceded that he did not witness any physical contact between Spaulding and Mrs. King at work because he "didn't work with them." King Dep. at 16:11. As Title VII protects individuals from discrimination in the employment context, plaintiff could not reasonably believe that this complaint, framed as a complaint from a parent of a Riverlawn student, implicated Title VII. As to the complaint that Spaulding gave plaintiff the middle finger during meetings, plaintiff has offered no evidence as to why he believed that such harassment or hostility was based on a protected trait under Title VII, such as race, religion, or sex.

As to the second factor, the court notes that the Fourth Circuit has repeatedly held that ostracization alone is insufficient to show an adverse employment action to support a retaliation

14

claim. See, e.g., Honor v. Booz–Allen & Hamilton, Inc., 383 F.3d 180, 189 (4th Cir. 2009) (concluding that plaintiff's allegations that he was "excluded from certain meetings and emails," that he received a negative employment evaluation, and that he was ostracized were not adverse employment actions); Matvia v. Bald Head Island Mgmt., 259 F.3d 261, 270-71 (4th Cir. 2001) (holding that the plaintiff's allegations of "uncivility" by her co-workers, "most of which constituted refusals to speak to her," did not constitute an adverse action to support a retaliation claim); Munday v. Waste Mgmt., Inc., 126 F.3d 239, 243 (4th Cir. 1997) ("In no case in this circuit have we found an adverse employment action to encompass a situation where the employer has instructed employees to ignore and spy on an employee who engaged in a protected activity."). On the other hand, the court recognizes that a failure to promote does constitute an adverse employment action and will limit its discussion solely to those allegations. See Hoyle v. Freightliner, LLC, 650 F.3d 321, 337 (4th Cir. 2011) (finding that an adverse employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits").

As to the third factor, the court does not believe that a reasonable jury could find a causal link between plaintiff's protected activities and the School Board's failure to promote him. In this case, plaintiff has not presented any direct proof of retaliatory intent and, thus, relies on indirect proof. To establish causation, a plaintiff must first show that the defendant had knowledge of his or her protected activity. Holland v. Washington Homes, Inc., 487 F.3d 208, 218 (4th Cir. 2007). Knowledge alone, however, does not establish a causal connection. Price, 380 F.3d at 213. In addition, temporal proximity between the protected activity and the adverse employment action may support an inference of causation, whereas temporal remoteness tends to

negate causation. See id. ("A causal connection for purposes of demonstrating a prima facie case exists where the employer takes adverse employment action against the employee shortly after learning of the protected activity."). However, if the plaintiff's evidence of causation is based solely on the temporal proximity between an employer's knowledge of protected activity and an adverse employment action, such temporal proximity must be "very close." Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001). Even if temporal proximity is missing, "courts may look to the intervening period for other evidence of retaliatory animus" which "may be used to establish causation." Lettieri v. Equant Inc., 478 F.3d 640, 650 (4th Cir. 2007). Other factors to show causation include inconsistent reasons by the employer for the adverse action and differential treatment of other employees. Linkous v. CraftMaster Mfg., Inc., No. 7:10-CV-00107, 2012 WL 2905598, at *8 (W.D. Va. July 16, 2012) (Turk, J.).

Here, as to his application for the principal position at Pulaski High in 2011, plaintiff has offered no evidence that Brown, who was responsible for selecting candidates to meet with the interview committee, had knowledge of plaintiff's complaints at the time he made such decision. Plaintiff only offers his own declaration as evidence, in which he states that he "applied for the first promotion within the Pulaski school system in or around the time [he] was complaining." King Decl. ¶ 4, Docket No. 56-10. Although the record in this case reveals that plaintiff began complaining about Spaulding's conduct in the fall of 2010, and that Brown recorded plaintiff's formal complaint against Spaulding on August 12, 2011, plaintiff cites to no evidence in the record to show that he applied for this position soon after Brown became personally aware of plaintiff's complaints in August of 2011. Furthermore, Brown testified that he learned about plaintiff's complaints that Spaulding had inappropriately touched plaintiff and gave him the middle finger at administrative meetings through this litigation. Brown Dep. 60:16-60:20; 63:9-

16

63:16. Plaintiff confirmed that he only reported the middle finger incidents to Keener,

Makolandra, and Dr. Michael Perry and did not report the inappropriate touching with anyone at

the School Board. King Dep. 25:15-26:1; 30:14-30:16. Therefore, no reasonable jury could find

a causal link between plaintiff's complaints and Brown's decision to not offer an interview to

plaintiff, absent evidence of knowledge, temporal proximity, or other retaliatory animus.

Similarly, as to the principal position at Pulaski Middle in 2011, it is undisputed that no

interviews were conducted, and that the superintendent at the time, Dr. Becker, had sole

discretion to select someone for that position. Plaintiff has offered no evidence to show that Dr.

Becker had knowledge of plaintiff's protected activities at the time he decided to transfer Reed to

that position, aside from a single assertion that Keener told plaintiff that Dr. Becker had said that

plaintiff "was causing a hostile environment because of [his] complaining." King Dep. 144:7-

144:11. In addition, plaintiff has not shown temporal proximity between Dr. Becker's hiring

decision and plaintiff's complaints. Furthermore, plaintiff does not cite to any other relevant

evidence from which a reasonable jury could find that there was a causal link between his

complaints and Dr. Becker's decision to select Reed for the principal position.

As an initial observation, the court believes that plaintiff cannot rely on temporal

proximity alone for the remaining adverse employment actions. The record reflects that

plaintiff's complaints were made in the fall of 2010 and August of 2011. Although there is no

bright-line rule for temporal proximity, the Fourth Circuit has held that a lapse of three to four

months between the employer's knowledge of protected activity and the alleged retaliation "is

too long to establish a causal connection by temporal proximity alone." Pascual v. Lowe's Home

Ctrs., Inc., 193 F. App'x 229, 233–34 (4th Cir. 2006). Thus, no reasonable jury could find a

causal link between plaintiff's protected activities and the School Board's failure to promote

17

plaintiff in 2012, 2013, and 2014 based on temporal proximity alone. Johnson v. Scott Cty. Sch. Bd., No. 2:12CV00010, 2012 WL 4458150, at *3 (W.D. Va. July 31, 2012) (Jones, J.) (dismissing retaliation claim because, "while it seems as if the report and demotion occurred within the same school year, [the plaintiff] does not specify exactly how much time elapsed between the two events").

Furthermore, as to plaintiff's applications for the principal positions at Critzer in 2012 and Pulaski Elementary in 2014, plaintiff has offered no evidence that any of the other interview committee members had prior knowledge of his complaints, or that Brown or Brewster influenced the interview committee members' rankings and recommendations. It is undisputed that the interview committee was solely responsible for recommending a candidate to the superintendent, and that Brewster always accepted the interview committee's recommendation. In addition to the lack of knowledge and temporal proximity, plaintiff has not provided any other relevant evidence showing retaliatory animus. Plaintiff admitted in his deposition that his belief that Brewster was responsible for his ostracization at work was merely speculation. Plaintiff also could not identify a single person who had told him that he was being ignored or avoided because of Brewster. Plaintiff's only evidence as to Brewster's conduct is through Ayer's testimony, in which she described the interactions between Brewster and plaintiff as "very tense" and confirmed that Brewster does not speak to plaintiff. Ayers Dep. 7:25-8:1. Similarly, plaintiff's only reason for believing that Brown was angry because of his complaint was his "shortness in answering or talking" to plaintiff, his "demeanor, [and] his body language" at the time he noted plaintiff's formal complaint against Spaulding. King Dep. 73:23-74:1. Plaintiff admits that this was simply his perception and cites to no other evidence that Brown had animus towards him. Overall, the court believes that plaintiff's evidence is insufficient to show a genuine

18

dispute of material fact as to the existence of retaliatory animus towards him. See Glover v. Oppleman, 178 F. Supp. 2d 622, 631 (W.D. Va. 2001) (Kiser, J.) ("Mere speculation by the non-movant cannot create a genuine issue of material fact."). Therefore, the court concludes that no reasonable jury could find a causal link between plaintiff's complaints and the School Board's failure to promote him to these positions.

As to the interim principal position at Pulaski Middle in 2013, it is undisputed that no interviews were conducted, and that Brewster had sole discretion to select someone for that position. Although the record reflects that Brewster was aware of plaintiff's complaints at the time he choose Rash to serve as the interim principal for the rest of the school year, knowledge alone is insufficient to show causation. Plaintiff does not cite to any other relevant evidence from which a reasonable jury could find that there was causal link between his complaints and Brewster's decision. Plaintiff merely disagrees with the choice and believes that he would have been a better candidate. In the absence of temporal proximity and other evidence of retaliatory animus, the court concludes that no reasonable jury could find that Brewster appointed Rash, and not plaintiff, because of plaintiff's complaints.

Finally, as to plaintiff's request for a transfer to Riverlawn in 2014, it is undisputed that no interviews were conducted, and that Brewster had sole discretion to grant the request. Again, the individuals who discussed plaintiff's request—Brown, Brewster, and Dr. Shirley Perry— were aware of plaintiff's complaints when Brewster denied plaintiff's request. However, plaintiff has not put forth any evidence to establish a causal link between his complaints and the transfer denial. Although, in general, a plaintiff may show causation through evidence that the employer gave inconsistent reasons for the adverse action and treated other employees differently, the court does not believe that plaintiff has shown such evidence in his case. In his deposition,

Brewster testified that he denied plaintiff's request because plaintiff would be supervising his ex-wife. Plaintiff admitted that school employees were not allowed to directly supervise their spouse. In his deposition, Brown testified that a new principal was starting at Dublin Middle, and that he did not believe that it would have been good for the students to have a whole new administration team at Dublin Middle. Furthermore, Bowler advised Brewster to deny plaintiff's request because Bowler did not "feel comfortable" working with him. Bowler Dep. 52:9-52:10. In his deposition, Bowler explained that the reason for this recommendation to Brewster was because of the allegations and accusations that plaintiff had made in the past and plaintiff's supervision of his ex-wife. Aside from Bowler's passing reference to plaintiff's complaints, plaintiff cites to no evidence to show that Brewster, who had sole discretion to grant or deny the transfer request, denied it because of plaintiff's complaints, rather than Brewster's proffered reason. Although Spaulding was granted a transfer to Critzer shortly before plaintiff's request, plaintiff offers no evidence that she would have been supervising her spouse, or that Riverlawn would have also had a new administrative team after her departure. Therefore, the court is not convinced that Spaulding received disparate treatment over plaintiff. As such, the court concludes that no reasonable jury could find that plaintiff has established a causal link between his complaints and the denial of his transfer request.

Even if the court could assume that plaintiff has presented a prima facie case, the court believes that the School Board has articulated legitimate, nonretaliatory reasons for its failure to promote plaintiff. As to the principal position at Pulaski High, the School Board asserts that plaintiff did not receive an interview because there were several applicants for the position, plaintiff had no experience as an administrator or a teacher at the high school level, and Brown believed that such experience was necessary to administer a large school like Pulaski High. As to

20

the principal position at Pulaski Middle, Brown testified that Dr. Becker selected Reed because there was a reduction-in-force at the time, and Reed's position had been dissolved and absorbed into other departments. For the principal positions at Critzer and Pulaski Elementary, several members of the interview committee asserted that plaintiff interviewed very poorly and did not seem prepared. As to the interim principal position at Pulaski Middle, Brewster testified that Reed left her position, and that Rash was selected because she had previously done an interim position at that school. Finally, as to plaintiff's transfer request to Riverlawn Elementary, Brewster denied the request because plaintiff would be supervising his ex-wife in violation of School Board policy. Based on these reasons, the court believes that the School Board has clearly met its burden of proffering nonretaliatory bases for not promoting plaintiff.

Ultimately, the court concludes that plaintiff has failed to proffer sufficient evidence to establish, by a preponderance of the evidence, that the School Board's reasons were false, and that retaliation was the real reason for the adverse employment actions. To carry his burden, plaintiff must demonstrate that the School Board's reasons are "unworthy of credence." Holland v. Wash. Homes, Inc., 487 F.3d 208, 218 (4th Cir. 2007). In evaluating pretext, the court does not "decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the [action]." Hawkins v. PepsiCo, Inc., 203 F.3d 274, 279 (4th Cir. 2000). As to the principal position at Pulaski High, there is no dispute that plaintiff did not have administrative or teaching experience at the high school level. Plaintiff's evidence is simply that he believed that he had the credentials for the position, and that others had told him that he performed his job well and would make a good principal. The court does not believe that such evidence is sufficient to show that Brown's reasons for not selecting plaintiff to interview are false or unworthy of credence. For the interim positions at Pulaski Middle, plaintiff cites to no

21

evidence that rebuts the School Board's assertions that the position had to be filled quickly and that there was no interview process for such transfers in general. The School Board has submitted evidence that the policy in place at the time of the transfers gave the superintendent the discretion to "reassign any such employee for that school year to any school or facility within such division." S. Perry Decl. Ex. 2, Docket No 51-11. Plaintiff's only evidence is his belief that the School Board should have conducted interviews for the positions. Again, the court believes that this unsupported assertion is insufficient to establish that the proffer basis for the School Board's failure to select him for these interim positions was pretext for retaliation.

"In a failure to promote case, the plaintiff must establish that [he] was the better qualified candidate for the position sought." Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 960 (4th Cir. 1996). As to the two positions for which plaintiff interviewed, the record reflects—even when construed in the light most favorable to plaintiff—that the selected candidates were qualified, had relevant experience, and interviewed very well. Plaintiff does not contest that the other candidates were qualified and performed well in their interviews. He also conceded that his interview for the principal position at Critzer went poorly. See King Dep. 95:15-95:16 ("Q: And the interview did not go well? A: I guess not. I didn't get the job."). Finally, plaintiff does not dispute that the interview committee members' assertions that they were looking for a candidate who could address the unique needs of Pulaski Middle, which was under a school improvement plan at the time.

Plaintiff's evidence in support of pretext is simply his belief that he was a better candidate and that he did not receive a fair interview. However, it is "the perception of the decisionmaker which is relevant not the self-assessment of the plaintiff." Beall v. Abbott Labs., 130 F.3d 614, 619 (4th Cir. 1997). Plaintiff cites to no evidence to show that he was better

22

qualified than the candidates who were ultimately selected. As to the principal position at Critzer, plaintiff simply asserts that he had more administrative experience than Grimm, and that Brown had previously stated that plaintiff would be an excellent elementary school principal. As to the principal position at Pulaski Elementary, plaintiff admitted that he had no knowledge of Smith's qualifications. Furthermore, the record shows that there were other well-qualified candidates who were not selected, which goes against plaintiff's argument that the School Board did not pick him in retaliation for his complaints. The court notes that the second-ranked candidate for the principal position at Critzer, Dr. Mickey Hickman, had more experience than plaintiff and had been the assistant principal at Critzer. Similarly, the second-ranked candidate for the principal position at Pulaski Elementary, Kim Sink, was the assistant principal at the school. Moreover, plaintiff contends that the thirty-minute interview process was unfair. Plaintiff, however, cites to no evidence to show that the other candidates received preferential treatment in their interviews. The record reflects that each candidate was asked the same questions and was given the same opportunity to answer them. See Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 960 (4th Cir. 1996) (granting summary judgment for a failure to promote claim because the evidence showed that the plaintiff was treated like another similarly situated individual). Also, plaintiff's assertion that the interview process was a mere formality, and that the positions had already been filled before the interviews, is wholly devoid of evidentiary support.

Finally, as to the School Board's nonretaliatory reason for denying plaintiff's request to transfer to Riverlawn, plaintiff has not offered any evidence to show that other employees were treated differently and were allowed to directly supervise their spouse or ex-spouse. In fact, the record reflects that the School Board had a policy that family members could not directly

23

supervise other family members. See S. Perry Decl. Ex. 2. The court need not determine whether the School Board's decision was correct, as long as it was truly the reason for denying plaintiff's request. Plaintiff has not cited to any other evidence that suggests that the School Board's reason is false or unworthy of credence. Overall, the court believes that no reasonable jury could find that the School Board's reasons for failing to promote plaintiff were mere pretext for retaliation.

For these reasons, the court concludes that plaintiff has failed to create a genuine issue of material fact for trial as to whether the School Board retaliated against him because of his complaints against Mrs. King and Spaulding. Accordingly, the School Board's motion for summary judgment will be granted.

### Conclusion

For the foregoing reasons, the court will grant the School Board's motion for summary judgment. The Clerk is directed to send copies of this memorandum opinion and the accompanying order to all counsel of record.

DATED: This 20th day of July, 2016.

_____
Chief United States District Judge

24